IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO. 5:19-CV-00035-KDB-DCK

| | |
|---|---|
| SCSI, LLC AND SCSI (SUZHOU) QUALITY SERVICE CO., LTD., <br><br>Plaintiffs,<br><br>v.<br><br>KACO USA, INC.,<br><br>Defendant. | <u>**ORDER**</u> |

**THIS MATTER** is before the Court on Defendant Kaco USA, Inc.'s ("Kaco") Motion for Partial Summary Judgment (Doc. No. 40) and Plaintiffs SCSI, LLC ("SCSI") and SCSI (Suzhou) Quality Service Co., LTD's ("SCSI Suzhou") Motion for Summary Judgment (Doc. No. 42). The Court has carefully considered these motions, the parties' briefs and exhibits and oral argument on the motions from the parties' counsel on December 17, 2020. In brief summary, the Court will **GRANT** Kaco's motion to dismiss SCSI Suzhou as a Plaintiff because SCSI Suzhou assigned all its rights and potential claims against Kaco to SCSI in a valid assignment. The Court will also, however, **GRANT** the remaining Plaintiff SCSI's motion for summary judgment because the Court concludes that a reasonable jury could not find for Kaco on SCSI's claims. As discussed in more detail below, Kaco indisputably incurred and accepted the obligation to pay SCSI Suzhou for the services it provided and repeatedly agreed to pay the resulting debt notwithstanding its knowledge of the substance of the defenses it now asserts. Therefore, SCSI is entitled to summary judgment on its claims for payment.

1

## I. LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). "The burden on the moving party may be discharged by 'showing' ... an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id*. at 324.

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014); *see also Anderson*, 477 U.S. at 255. "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting

10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)). "The court therefore cannot weigh the evidence or make credibility determinations." *Id*. at 569 (citing *Mercantile Peninsula Bank v. French* (*In re French*), 499 F.3d 345, 352 (4th Cir. 2007)).

However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Also, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Id*. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id*. at 249-50.

In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." *Id*. at 252.

## II.     FACTS AND PROCEDURAL HISTORY

SCSI and SCSI Suzhou are in the business of providing quality control sorting services to automakers and automotive suppliers throughout the United States, Europe and Asia. More specifically, Plaintiffs sort and contain defective or non-compliant parts to prevent such parts from entering the supply chain and ultimately being incorporated into vehicles assembled and sold by automakers. Kaco is a supplier of radial shaft seals and bonded piston seals for engines, gearboxes and compressors to General Motors and other companies. This dispute arises out of two contracts between Kaco and SCSI Suzhou under which SCSI Suzhou agreed to serve

3

as a quality control representative and provide inspection services in General Motors plants in China for parts manufactured by Kaco at its plant in Lincolnton, North Carolina.

In 2014, SCSI Suzhou agreed to serve as Kaco's quality representative in China (the "Quality Rep. Agreement"). The agreement provided that SCSI was to invoice Kaco quarterly, and Kaco had thirty days to pay upon receipt of each invoice. (Doc. 43-2 at 4). In 2017, Kaco and SCSI Suzhou entered into a second agreement in which SCSI Suzhou agreed to provide sorting and containment services for Kaco's automotive parts (the "Containment Agreement"). Under the Containment Agreement, SCSI Suzhou agreed to sort and contain defective seal spring covers at two plants in China. (Doc. No. 43-3 at 2.) The scope of work on the parts was to be determined based on criteria decided by the automaker (*Id*.) The parties agreed that the number of SCSI Suzhou inspectors sorting Kaco parts would be flexible and determined by Matthew Mierendorf, Kaco's Account Manager. (*Id*. at 2; Doc. No. 43-4, Mierendorf Deposition, at 54.) Mr. Mierendorf in turn gave SCSI Suzhou discretion to "arrange the number of inspectors" required to keep the production volumes so as to not "starve the line."

The Containment Agreement authorized SCSI Suzhou to invoice Kaco for the services rendered at the rates agreed upon by the parties, (Doc. No. 43-3 at 2-4), and SCSI Suzhou invoiced Kaco weekly for its services. (Doc. No. 43-1, Finneran Decl. at ¶10). With respect to payment, the Containment Agreement provided:

> Payment for services is due 30 days from receipt of invoice. A service charge of 1.5% per month will be applied against the outstanding balance until paid in full. Should collection or litigation become necessary, the customer agrees to pay all collection charges including reasonable attorney fees and court costs. SCSI terms are net as invoiced. All taxes, duties, license fees and additional withholdings are the sole burden of the customer to ensure net payment to SCSI.

(Doc. No. 43-3 at 4.)

4

Together with the weekly invoices, SCSI Suzhou sent Kaco a report including weekly summaries and daily results of SCSI's containment services for the invoiced period. These detailed reports included information such as work description, number of parts sorted, number of hours worked, travel expenses and issues with the parts. (*See, e.g.*, Doc. 43-7 at Exs. 9-51). Mr. Mierendorf testified without contradiction that the data included with these reports enabled Kaco to determine SCSI Suzhou's sorting rate using "basic math." (Doc. No. 43-4 at 60-61).

The Containment Agreement required Kaco to "provide feedback according [sic] daily result within 24 hours once receive [sic], otherwise will be considered approved[.]" Thus, if Kaco did not object to or contest the daily reports within 24 hours of receipt then the services were deemed accepted under the agreement. (*See* Doc. No. 43-3 at 3, note 9; Doc. No. 43-4 at 62-64). Kaco acknowledges that it received each of the invoices at issue, along with the daily reports. Also, Kaco has not provided evidence of an objection to an invoice during the 24 hour period following receipt. (*See* Doc. No. 43-4 at 39-40, 57-58, 63-64.) Kaco contends, however, that this process did not satisfy SCSI Suzhou's obligation to provide "daily reports."[1]

Soon after Kaco and SCSI Suzhou entered into the Containment Agreement, Kaco and its automaker customer began to disagree on the scope of SCSI Suzhou's sorting and containing services. Kaco believed the customer was asking SCSI Suzhou to sort for more issues than necessary and that, as a result, the rejection rate for certain parts was too high. Kaco also was concerned that SCSI Suzhou was using more inspectors than was necessary and specifically

---

[1] Kaco argues that the Containment Agreement required SCSI Suzhou to provide reports daily concerning the relevant operations. However, the agreement does not contain a specific requirement that SCSI Suzhou *deliver* reports daily; rather, it only requires that information on daily results be given to Kaco, presumably within a reasonable time period. Kaco does not argue that providing this information weekly was unreasonable nor did it object to the timing of the reports during the parties' relationship – it simply argues (incorrectly) that the daily results were required to be disclosed daily.

5

requested that the customer "take a closer look at [SCSI Suzhou's] rate of inspection." However, Kaco admits that to ensure that the issue did not cause an immediate problem for production, it authorized the additional inspectors for the "short term" under the understanding that "we could review at a later date." (Doc. No. 43-4 at 92). Ultimately, SCSI Suzhou did not scale back its number of inspectors or improve its sorting rate, which Kaco says prompted it to provide additional training and instruction to SCSI Suzhou in early 2018. (Doc. No. 43-24 at 3-4).

For its part, SCSI believed it was required to honor the customer's requests under the following provision in the Containment Agreement that provided that SCSI Suzhou's scope of work would be determined by criteria set forth by the customer rather than Kaco:

> At times while SCSI is working on-site with [the customer] on [Kaco] parts, [the customer] may mandate certain operating procedures that SCSI must follow. This would also apply to any internal quality issue. SCSI will honor these requests. [Kaco] understand[s] and agree[s] that SCSI will charge [Kaco] and [Kaco] will be responsible for time and materials necessary to meet those requirements. It is understood that these Terms and Conditions shall apply for all charges undertaken at [Kaco] or [the customer]'s request.

(Doc. No. 43-3 at 5). Thus, SCSI Suzhou used the amount of inspectors it believed was necessary to inspect a certain number of parts per day as directed by the customer.[2]

In addition to the issue of additional inspectors, Kaco claims that SCSI Suzhou failed to properly sort the products to ensure that nonconforming parts did not enter the customer's assembly line. The SCSI Suzhou sorting errors are allegedly reflected by the issuance of a credit

---

[2] Plaintiffs also suggest that they were fully transparent in telling Kaco about the increased costs that would result from the larger number of inspectors and that Kaco made the business decision to continue engaging SCSI Suzhou for sorting and containing services on the customer's program for a number of reasons, including other costs, training considerations, and the fact that SCSI's services were only intended to be a "temporary" measure. (*See* Doc. No. 43-4 at 88-89, 91-92, 99).

6

memo from the customer to Kaco, by which the customer assessed Kaco for the scrapping cost of the nonconforming parts. (*See* Doc. 45-1). Kaco further claims that SCSI Suzhou's failure to properly sort parts prompted the customer to engage a third party to review and re-sort the parts already sorted by SCSI Suzhou at significant expense to Kaco. (*See* Doc. No. 45-2 (August 27, 2018 Credit Memo)). According to Kaco, each time the customer engaged third party inspectors, it would either assess the cost of the inspection to SCSI Suzhou to be passed on to Kaco or it would issue a credit memo for the cost of the third party inspection. (*Id.*).[3]

Kaco ultimately fell behind on payments due under both contracts. From April 2017 through June 2018, Kaco did not pay 49 invoices, totaling $456,461.58 (the "Outstanding Balance"). (*See* Doc. No. 43-1, Finneran Decl. at ¶ 14, Ex. 9, Invoice Summary.) Specifically, there are five quarterly invoices under the Quality Rep. Agreement and 44 invoices under the Containment Agreement that are unpaid. SCSI repeatedly contacted Kaco regarding payment of the unpaid invoices from April 2017 to April 2018. In response, Kaco acknowledged its debt and made ongoing promises to pay, blaming its delayed payments on cash flow problems, disputes with the customer and the customer's suppliers, bank issues, and misdirected wire payments. (*See* Doc. No. 43-1 at ¶ 17; Doc. No. 43-4 at 108-09, 111, 151; Doc. Nos. 43-11, 43-12, 43-13, 43-14, 43-15, 43-16, 43-17, 43-18, 43-19, 43-20).

Ultimately, on May 25, 2018, after promised payments on the balance due did not arrive, SCSI Suzhou notified Kaco of the non-payment and explained that it would not continue without payments. When Kaco did not promptly respond, SCSI Suzhou told Kaco that it would stop all work on June 1, 2018.

---

[3] At oral argument, Kaco clarified to the Court that it was offering the credit memos only as corroborating evidence of SCSI Suzhou's performance failures and was not seeking any direct credit or offset to the invoice amounts claimed by SCSI based on the amount of the credit memos.

7

On May 31, 2018 Kaco advised SCSI Suzhou that it had "questions" regarding the outstanding invoices. SCSI Suzhou responded by reminding Kaco that it had already promised to pay past due invoices and telling Kaco that it was notifying the customer that it was stopping its services for Kaco. On June 1, 2018, SCSI Suzhou advised Kaco's customer that it was terminating its relationship with Kaco and that its support would only continue through the end of the day. (*See* Doc. No. 43-23). SCSI Suzhou sent its last invoice to Kaco on June 19, 2018, which remains unpaid.

On September 1, 2018, SCSI Suzhou assigned and transferred its rights and interests under the relevant contracts to SCSI, an affiliated company in the United States. (*See* Doc. No. 22 at Exhibit 1). The original Complaint in this action was filed on March 28, 2019 by SCSI. (Doc. No. 1). In its Answer, Kaco contested the alleged assignment and asserted that SCSI was "not the real party in interest pursuant to Federal Rule of Civil Procedure 17 and [could] not proceed with the prosecution of this action." Plaintiffs thereafter filed an Amended Complaint, which included SCSI Suzhou as an additional plaintiff. (Doc. No. 22). In the Amended Complaint, Plaintiffs allege a breach of contract and, alternatively, an "account stated" and unjust enrichment claim. Plaintiffs also seek to recover their costs and the expenses of collection, including reasonable attorneys' fees and interest on the debt.

Plaintiffs seek summary judgment on all their claims, arguing that the parties entered into these service contracts, that SCSI performed its duties under each contract and that Kaco failed to pay amounts properly invoiced for SCSI's work. Kaco does not contest that SCSI Suzhou has submitted multiple invoices that remain unpaid. Kaco does contend, however, that it is not liable to the Plaintiffs for the amounts sought and contends that SCSI Suzhou did not perform its work in accordance with the terms of the contracts. Also, Kaco contends in its own motion for partial

8

summary judgment that the assignment between the Plaintiffs (if valid) requires the dismissal of SCSI Suzhou as a Plaintiff because the right to assert the Plaintiffs' claims now belongs solely to SCSI as the assignee of the contracts.

### III. DISCUSSION

#### A. Kaco's Motion for Partial Summary Judgment

In its motion for partial summary judgment, Kaco asks the Court to dismiss one of the Plaintiffs based on its contention that because of the assignment of claims between them that SCSI and SCSI Suzhou cannot both have standing to bring this action. Kaco argues that while a party is generally allowed to assign its interest in a contract, if a person has assigned its interest in a claim, they are no longer a real party in interest and lack standing to sue. On the other hand, if the legal title remains with the assignor, suit must be brought in the name of the assignor. *Carozza v. Boxley*, 203 F. 673, 677 (4th Cir. 1913).

An assignment is substantially a transfer, actual or constructive, with the clear intent at the time to part with all interest in the thing transferred and with a full knowledge of the rights so transferred. *Morton v. Thornton*, 259 N.C. 697, 699, 131 S.E.2d 378, 380 (1963). Thus, Plaintiffs cannot have both SCSI and SCSI Suzhou as parties if there is a valid assignment that covers all of Plaintiffs' claims.

The September 1, 2018 Assignment Agreement between SCSI and SCSI Suzhou provides, in relevant part:

> For value received, ASSIGNOR [SCSI (Suzhou)] assigns and transfers to ASSIGNEE [SCSI, LLC], all of its rights, title and interest, with respect to Kaco USA Inc., a North Carolina Corporation ("KACO"), and specifically all of its rights, title and interest in the KACO USA INC. CHINA QUALITY REPRESENTATION PROPOSAL and the AUTHORIZATION TO PROCEED WITH JOB REQUEST ("Contracts"), executed by ASSIGNOR and KACO, subject to all the conditions and terms contained in the Contracts, to have and to hold from September 1, 2018 until the end of time.

9

Doc. No. 22-4. The Court finds that there is no genuine dispute as to the validity of this assignment. While Kaco has asserted concerns about the assignment based on Plaintiffs' lack of responsiveness to discovery questions regarding the identity and role of the signatories to the assignment, there is no evidence in the record that would raise an actual disputed factual issue regarding the validity of the assignment, which has been properly authenticated by Plaintiffs.

Having found that the assignment is valid, the Court must determine if the assignment covers the claims asserted in this action. By assigning "all of its rights, title and interest" with respect to Kaco, the broad assignment clause plainly includes all of the claims in this action, including the "unjust enrichment" claim asserted as an alternative to Plaintiffs' breach of contract and account stated claims. Having assigned all its claims related to Kaco, SCSI Suzhou has no remaining rights or claims to pursue in this action. Therefore, the Court finds that Kaco's motion for partial summary judgment should be granted and SCSI should be the lone Plaintiff asserting all the claims in this action.

### B. SCSI's Motion for Summary Judgment

#### 1. Breach of Contract Claim

To succeed on its breach of contract claim, SCSI must establish the following: (1) existence of a valid contract; (2) breach of the terms of that contract; and (3) resulting damages. *Bank of Am., N.A. v. McFarland*, 263 N.C. App 15, 17; 823 S.E.2d 143 (2018); *see also Tasz, Inc. v. Industrial Thermo Polymers, Ltd.*, 80 F.Supp.3d 671, 681 (W.D.N.C. 2015). SCSI Suzhou provided its services under the Quality Rep Agreement when it acted as a liaison with Kaco's customer and under the Containment Agreement when it provided sorting services for Kaco at the China plants. The consideration for those services is set forth in the contracts. Accordingly,

as admitted by Kaco, there is no dispute that both the Quality Rep. Agreement and the Containment Agreement reflect valid, enforceable contracts. *See* Doc. No. 45 at 6.

Also, there is no genuine dispute that, absent a valid and sufficient countervailing reason, Kaco's failure to pay past due invoices constitutes a breach of its obligation to pay for services rendered under the contracts. "When the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court, and the court cannot look beyond the terms of the contract to determine the intentions of the parties." *Asheville Mall, Inc. v. F.W. Woolworth Co.*, 76 N.C. App. 130, 132, 331 S.E.2d 772, 773–74 (1985). Upon receipt of an invoice, Kaco was required to pay the amount due within thirty (30) days. Kaco admits to receiving the 49 invoices at issue in this case, admits it did not dispute the services provided under each invoice within the time period agreed in the contracts, and admits it still has not paid the invoices. Therefore, unless otherwise excused, Kaco's failure to pay these invoices within 30 days of receipt constitutes a breach of the plain terms of the contracts.

Kaco defends against this straightforward breach of contract analysis by arguing there are genuine issues of fact relating to Plaintiffs' performance under the Containment Agreement that either excuse Kaco's obligations under the contract or require findings by the trier of fact to determine the appropriate amount owed to Plaintiffs. As discussed below, the Court disagrees with Kaco and finds that the record does not establish any genuine factual disputes that would excuse Kaco from paying SCSI.

"As a general rule, if either party to a bilateral contract commits a material breach of the contract, the non-breaching party is excused from the obligation to perform further." *McClure Lumber Co. v. Helmsman Constr., Inc.*, 160 N.C. App. 190, 198, 585 S.E.2d 234, 239 (2003). A breach is considered material if it "substantially defeats the purpose of the

11

agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform." *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 220, 768 S.E.2d 582, 593 (2015) (quoting *Long v. Long*, 160 N.C. App. 664, 668, 588 S.E.2d 1, 4 (2003)).

Here, Kaco contends that SCSI Suzhou's rate of inspection was too low and that it utilized an unnecessarily high number of inspectors to perform the sorting services contemplated under the Containment Agreement. However, there are at least two fundamental deficiencies in Kaco's argument. First, it does not appear that using a particular "number of inspectors" or the "rate of inspection" reflect obligations under the contract that could be "materially breached" by SCSI Suzhou. Indeed, Kaco admitted both in its briefing and at oral argument that there are no specific requirements in the contracts as to these measures of performance. *See* Doc. No. 45 at 2 ("the parties specifically did not set a number of inspectors to be used … in order to maintain flexibility relative to variable production rates").

Further, any argument that the number of inspectors and rate of inspection falls so far below "industry standards" that it constitutes a material breach is foreclosed by the second critical failing of Kaco's position, which is that it both expressly approved the number of inspectors (*see* Doc. No. 43-3 at 7; Doc. No. 45 at 3)[4] and failed to timely raise objections to the invoices as discussed above, even though the information necessary to calculate the "rate of inspection" and other performance measures it now urges violate the contract was always readily available. Accordingly, the Court concludes that no reasonable jury could find that SCSI Suzhou

---

[4] Kaco notes that it approved the number of inspectors only "in the short term," intending to "review" the number at a later date. However, this alleged fact does not in any way diminish the import of its acknowledged approval of the number of inspectors during the time period reflected in the invoices. In other words, even if Kaco might have upon later review changed the number of inspectors, it is still bound by its approval - on which SCSI Suzhou was entitled to rely - until it made such a change. Indeed, Kaco conceded at oral argument that there was no evidence in the record that the parties ever agreed to use fewer inspectors.

committed a material breach of the contracts sufficient to excuse Kaco's duty to perform, i.e. pay SCSI.

In addition to alleging that SCSI Suzhou materially breached the Containment Agreement, Kaco urges the Court to find that summary judgment may not be granted because there are disputed factual issues as to the amount owed to SCSI. However, for the same reasons that Kaco cannot prove a material breach of the contracts – there is no contractual standard of performance that was breached and Kaco either approved or did not timely object to SCSI Suzhou's work – Kaco is not entitled to a trial on whether the amount of the accepted invoices should be reduced on account of the alleged performance failures.

Therefore, SCSI is entitled to summary judgment on its claim for breach of contract.[5]

### 2. Award of Damages

In North Carolina, where a breach of contract has occurred, the law generally allows the non-breaching party to be "made whole" – *i.e.*, obtain the benefit of the bargain contained in the contract. *See Strader v. Sunstates Corp.*, 500 S.E.2d 752, 129 N.C. App. 562 (1998) ("As a general rule, the injured party in a breach of contract action is awarded damages which attempt to place the party, insofar as possible, in the position he would have been in had the contract been performed."). Here, SCSI contracted for payment from Kaco in exchange for services rendered by SCSI. SCSI has alleged and Kaco has not disputed that the total amount of the 49 unpaid invoices is $456,461.58. *See* Doc. No. 43-9, Invoice Summary. Therefore, SCSI is entitled to recover the Outstanding Balance.

---

[5] In light of the Court's resolution of SCSI's claim for breach of contract, it need not reach its alternate Account Stated claim. While there are different elements to the two claims, the core findings of the Court as to Kaco's liability to pay for SCSI Suzhou's services and the amount of that liability overlap such that the Court would likely reach the same result under either claim.

13

In addition to the Outstanding Balance, SCSI claims that it is also entitled to attorneys' fees, interest, and costs. In an action based on contract, attorneys' fees may be awarded when (1) the contract so provides and (2) attorneys' fees are authorized by statute. *Wri/Raleigh, L.P. v. Shaikh*, 644 S.E.2d 245, 250 (N.C. Ct. App. 2007). Here, the Containment Agreement provides for interest, attorneys' fees, and costs for having to bring legal action to collect on the unpaid invoices. (Doc. No. 43-4) ("A service charge of 1.5% per month will be applied against the outstanding balance until paid in full. Should collection or litigation become necessary, the customer agrees to pay all collection charges including reasonable attorney fees and court costs.").

North Carolina courts have held that attorney fee provisions located in contracts such as the Containment Agreement at issue here are enforceable and authorized under N.C. GEN. STAT. § 6-21.2, as "evidence of indebtedness." *See Stillwell Enters., Inc. v. Interstate Equip. Co.*, 266 S.E.2d 812, 817 (N.C. 1980) (extending § 6-21.2's "evidence of indebtedness" to "any printed or written instrument, signed or otherwise executed by the obligor(s), which evidences on its face a legally enforceable obligation to pay money.") Here, because the Containment Agreement is a contract that places on Kaco the obligation to pay SCSI for services rendered, it constitutes a written instrument evidencing a legally enforceable obligation to pay money. *See also* N.C. GEN. STAT. § 6-21.6(e) (noting that "[n]othing in this section shall in any way make . . . invalid attorneys' fee provisions in consumer contracts or in any note, conditional sale contract, or other evidence of indebtedness that is otherwise governed by N.C. GEN. STAT. § 6-21.2.").

Accordingly, SCSI is entitled to recover attorneys' fees in addition to the principal amount of its recovery together with interest and costs upon a proper motion detailing and supporting such fees. The parties will be directed to confer on the amount of interest, costs and attorneys'

14

fees due under the contract and present a proposed judgment to the Court (or the parties' respective arguments regarding the amount of the interest, costs and fees if there is no agreement).

IV. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendant's Motion for Partial Summary Judgment (Doc. No. 40) is **GRANTED** and SCSI Suzhou is hereby dismissed as a party to this action**;**

2. SCSI's Motion for Summary Judgment (Doc. No. 42) is **GRANTED;** and summary judgment is hereby entered in favor of SCSI on its claim for breach of contract; and

3. The parties are directed to meet and confer on the amount of the judgment to be entered consistent with the Court's ruling and file the proposed judgment (or the parties' respective positions on the amount of the judgment along with SCSI's motion for attorneys if the amount is not agreed) on or before January 20, 2021.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: December 22, 2020

Kenneth D. Bell
United States District Judge